UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

b

| | |
|---|---|
| PAMELA KAYE RICHARD | CIVIL ACTION NO. 2:16-CV-01595 |
| VERSUS | JUDGE TRIMBLE |
| CAROLYN W. COLVIN[1] | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

I. Background

A. Procedural History

Pamela Kaye Richard ("Richard) filed an application for disability insurance benefits ("DIB") on October 9, 2013, alleging a disability onset date of May 20, 2011 (Doc. 11-1, p. 132/249) due to bipolar disorder 1 mixed, agoraphobia, fibromyalgia, depression, anxiety/panic disorder, chronic fatigue syndrome, and general pain disorder (Doc. 11-1, p. 150/249). That application was denied by the Social Security Administration ("SSA") (Doc. 11-1, p. 80/249).[2]

A *de novo* hearing was held before an administrative law judge ("ALJ"), at which Richard appeared with her attorney and a vocational expert ("VE") (Doc. 11-1, p. 30/249).

The ALJ found that, although Richard suffers from a severe impairment, fibromyalgia, she has the residual functional capacity to do the full range of sedentary

---

[1] Nancy Berryhill replaced Carolyn Colvin as Acting Commissioner on January 23, 2017.

[2] Richard filed a prior application for DIB on May 4, 2010 (Doc. 11-1, p. 52/249). The ALJ's May 19, 2011 decision was unfavorable to Richard (Doc. 11-1, p. 62/249). The Appeals Council declined to review that decision, and the ALJ"s decision became the final decision of the Commissioner (Doc. 11-1. p. 67/249). Apparently, Richard did not appeal that decision.

work and, therefore, could still do her past relevant work as an administrative coordinator and a cash accounting clerk (Doc. 11-1, pp. 15, 19, 23/249). The ALJ concluded that Richard was not disabled at any time from May 11, 2011 through the date of his decision on August 15, 2015 (Doc. 11-1, p. 24/249).

Richard requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 11/1, p. 4/249) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Richard next filed this appeal for judicial review of the ALJ's decision. Richard raises the following issues on appeal (Doc. 12):

1. The ALJ failed to properly assess Richard's mental impairments at Step 2.

2. The residual functional capacity determination of "light" work is not supported by substantial evidence.

The Commissioner filed a response to Richard's appeal (Doc. 16), to which Richard replied (Doc. 17). Richard's appeal is not before the Court for disposition.

B.  Medical Records.

In May 2011, Richard was treated at Brentwood Hospital, in Shreveport, Louisiana, for mixed bipolar disorder I and depression (Doc. 11-1, pp. 232-33/249).

In October 2012, Richard was treated by Dr. Said H. Cantu, a neuropsychiatrist (Doc. 11-1, pp. 225-26/249). Dr. Cantu found Richard suffered from fatigue, hypersomnia, and a euthymic (normal) mood, and he diagnosed bipolar disorder (Doc. 11-1, pp. 225-26/249). Dr. Cantu continued Richard's medications (Inderal, Cogentin, Geodon, and Xanax) (Doc. 11-1, p. 226/249). Richard's symptoms

were the same in January 2013, and her medications were continued (Doc. 11-1, pp. 223-24/249).

In February 2013, Richard's mood was dysthymic/depressed and her affect was abnormal and constricted (Doc. 11-1, p. 221/249). Richard was diagnosed with bipolar affective disorder and prescribed Zoloft (Doc. 11-1, p. 221/249).

In May 2013, Richard's mood was euthymic and her affect was normal (Doc. 11-1, p. 218/249). Richard was taking Geodon, Xanax, Cogentin, and Inderal for her bipolar disorder, manic unspecified, and Zoloft for her bipolar affective disorder (Doc. 11-1, p. 220/249). Richard's medications were continued (Doc. 11-1, p. 217/249).

In August 2013, Richard's mood was dysthymic/depressed, her affect was abnormal and constricted, and she reported anxiety and smoking every day (Doc. 11-1, p. 216/249). In November 2013, Richard's condition was the same, except her affect was normal (Doc. 11-1, pp. 213-14/249). Dr. Cantu found Richard's overall condition was fair, diagnosed bipolar disorder and moderate depression, continued her Geodon, propranolol, Xanax, and Cogentin, and increased her Zoloft dosage (Doc. 11-1, pp. 213-14/249).

In January 2014, Dr. Cantu noted Richard was anxious and wanted to stop taking Zoloft, claiming it was not working (Doc. 11-1, p. 245/249). Dr. Cantu found Richard's mood was dysthymic and depressed, and her affect was abnormal and constricted (Doc. 11-1, p. 244/249). Dr. Cantu diagnosed bipolar disorder and moderate depression, and prescribed Wellbutrin XL (Doc. 11-1, p. 245/249).

3

In February 2014, a state disability determinations consultant, Joseph Kahler, Ph.D., reviewed Richard's medical records and found her affective disorders were not severe (Doc. 11-1, pp. 75/249). Dr. Kahler found Richard had no more than mild restrictions in functioning, and there was no evidence of more than mild work-related limitations attributable to mental disorders (Doc. 11-1, p. 75/249).

In April 2014, Dr. Cantu found Richard's affect was normal, but her mood was still dysthymic and depressed, and continued her medications (Doc. 11-1, p. 242-43/249). In May 2014, Richard's affect was normal and her mood was dysthymic, Dr. Cantu diagnosed bipolar disorder, manic (unspecified), and prescribed tramadol HC1 (Doc. 11-1, p. 241/249). In October 2014, Richard's mood was still dysthymic, and she had anergia, poor ambition to do things, and was isolated and withdrawn (Doc. 11-1, p. 239/249). Richard was prescribed Wellbutrin XL, Xanax, XR, Geodon, Cogentin, propranolol HCl, and Adipex-P (Doc. 11-1, p. 2239-40/249).

Dr. Cantu filled out a mental residual functional capacity assessment of Richard in November 2014, to assess her bipolar disorder and anxiety (Doc. 11-1, p. 234/249). Richard's symptoms were decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thinking about suicide but not planning it, generalized persistent anxiety, emotional withdrawal and isolation, and decreased energy (Doc. 11-1, p. 234/249). Dr. Cantu noted that Richard's husband usually accompanies her when she leaves home (Doc. 11-1, p. 234/249). Dr. Cantu found that, in a normal workday and workweek, Richard is moderately limited in her ability to understand and remember very short and simple instructions; extremely

4

limited in her ability to understand and remember detailed instructions; moderately limited in her ability to carry out very short and simply instruction; extremely limited in her ability to carry out detailed instructions; extremely limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; markedly limited in her ability to sustain an ordinary routine without special supervision; markedly limited in her ability to make judgments on simple work-related decisions; extremely limited in her ability to interact appropriately with the public; extremely limited in her ability to ask simple questions or request assistance; moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; markedly limited in her ability to respond appropriately to changes in the work setting; and extremely limited in her ability to set realistic goals or make plans independently of others (Doc. 11-1, pp. 235-36249). Dr. Cantu further stated that Richard has anxiety issues, especially with people; and social anxiety that causes panic and makes her an unstable employee (Doc. 11-1, p. 236/249).

In January 2015, Richard reported doing well on her medications, was not feeling fatigue, had lost 20 pounds, and had more sexual desire, but her mood was still dysthymic (Doc. 11-1, p. 237/249).

Richard was evaluated by Dr. Ladislas Lazaro IV, a rheumatologist, in July 2013. Dr. Lazaro noted Richard's diagnosis of fibromyalgia five years before, and her history of symptoms prior to that (Doc. 11-1, p. 204/249). Richard complained of hurting all over all of the time, the pain fluctuating in intensity based on activity and

causing her to become increasingly sedentary over the past few years (Doc. 11-1, p. 204/249). Richard did not have any arthritic joint swelling, but had weight gain and mild edema (Doc. 11-1, p. 204/249). Richard had not exercised in the past five years (Doc. 11-1, p. 204/249). Richard also complained of constant fatigue (Doc. 11-1, p. 204/249). Richard was 5' 3 ½" tall, weighed 221 pounds, and her blood pressure was 130/76 (Doc. 11-1, p. 205/249). She lived at home with her husband and step-children, and smoked one-half pack of cigarettes per day (Doc. 11-1, p. 205/249). Richard reported sleeping 14 to 16 hours per day (Doc. 11-1, p. 207/249).

Dr. Lazaro found Richard has been diagnosed with bipolar disorder, for which she was taking alprazolom ER, sertraline, propranolol, benzotropine, and Geodon, and going to weekly counseling (Doc. 11-1, p. 204/249). Richard also had worsening depression, anxiety, and panic attacks (Doc. 11-1, p. 205/249).

Dr. Lazaro noted that Richard had stopped working in 2008, went on short-term disability, was subsequently declined for long-term disability, so she returned to work from the end of 2008 to about the end of 2009, when she missed work frequently (Doc. 11-1, p. 204/249). Richard went on short-term disability again from 2009 until about 2010, and has not worked since (Doc. 11-1, p. 204/249).

Dr. Lazaro found Richard had full ranges of motion, and all fibromyalgia trigger points were present with "very light palpation," particularly in the sternum (Doc. 11-1, p. 206/249). Dr. Lazaro diagnosed fibromyalgia syndrome (secondary) and bipolar disorder (primary) (Doc. 11-1, p. 206/249). Dr. Lazaro believed Richard's biggest problem was deconditioning, and she needed physical therapy to be

6

reconditioned (Doc. 11-1, p. 207/249). Dr. Lazaro noted the difficulty and challenge in the treatment and management of the combination of fibromyalgia and bipolar disorder, and stated that all medication management should be left up to her neuropsychologist (Doc. 11-1, pp. 206-07/249).

In March 2014, Dr. Lazaro saw Richard again and noted she was doing well with Neurontin (Doc. 11-1, p. 249/249). Richard complained of constant anxiety and increased fatigue, but had recently started Buspirone, which seemed to help (Doc. 11-1, p. 249/249). Richard weighed 232.5 pounds and her blood pressure was 132/77 (Doc. 11-1, p. 249/249).

In September 2014, Richard complained of aching everywhere, particularly in her upper back (Doc. 11-1, p. 248/249). Dr. Lazaro noted she was taking Wellbutrin (Doc. 11-1, pp. 248/249).

In March 2015, Richard was stiff and sore, worse with the cold, and hurting all over, particularly in her upper back (Doc. 11-1, p. 247/249). Richard reported she had started taking Vyvanse (Doc. 11-1, p. 247/249). Richard's weight was 210 pounds (Doc. 11-1, p. 247/249).

In September 2014, Dr. Lazaro filled out a medical statement regarding Richard's physical abilities and limitations (Doc. 11-1, p. 231/249). Dr. Lazaro wrote that Richard can lift/carry less than 10 pounds both occasionally and frequently; can stand/walk a total of at least two hours in an eight hour day; can sit a total of six hours in an eight hour day, but must periodically alternate sitting and standing to relieve pain/discomfort; can reach occasionally with either arm; can handle things

7

frequently with either hand; can finger frequently with either hand; must change position every 1 to 2 hours; and must take a break every 2 to 3 hours (Doc. 11-1, p. 231/249). Dr. Lazaro noted that Richard's right hand is dominant (Doc. 11-1, p. 231/249). Dr. Lazaro further stated that Richard's medication will not cause her difficulty with concentrating (Doc. 11-1, p. 231/249). Richard will miss, be late, or leave early from work 1 to 4 times per year (Doc. 11-1, p. 231/249).

### C. Administrative Hearing

At her March 2015 administrative hearing, Richard testified she was 41 years old, completed high school and two years of college, and can read, write, and do simple math (Doc. 11-1, pp. 33-34/249). Richard testified she has past work as an administrative coordinator, a service manager, a lobby clerk, a service supervisor, and a cashier (Doc. 11-1, pp. 34/249). Richard has not worked since May 2011 (Doc. 11-1, p. 34/249).

Richard testified that she can no longer work because she has "extreme agoraphobia" and has difficulty just standing in her front yard (Doc. 11-1, p. 34/249). Richard does not leave her house without her husband (Doc. 11-1, p. 34/249). Richard further testified that she panics when she goes outside to smoke and someone drives too slowly past her house, or when she goes to places she is not familiar with (Doc. 11-1, p. 35/249). Richard cries a lot, mostly because of pain (Doc. 11-1, p. 35/249).

Richard testified her pain is worst in her joints, hands, forearms, between her shoulder blades, lower back, knees, and feet (Doc. 11-1, p. 36/249). Richard has breathing problems when she has a panic attack, or when the pain in her back makes

it difficult to breathe (Doc. 11-1, p. 36/249). Richard has pain in her back if she sits too long, so she has to get up every 30 minutes (Doc. 11-1, p. 36/249). Richard can stand 10 to 15 minutes before she needs to sit down (Doc. 11-1, p. 37/249). Richard also has dry mouth (Doc. 11-1, p. 37/249).

Richard's hands ache if she writes for two minutes, so she needs to rest them for about 10 minutes (Doc. 11-1, pp. 37-38/249). The pain in her hands makes it difficult for Richard to fill out forms (Doc. 11-1, p. 38/249). Richard described the pain as aching and burning (Doc. 11-1, p. 39/249).

Richard testified that she does not have a lot of energy, sleeps 12 to 14 hours per day, and takes her medication when she wakes up (Doc. 11-1, p. 39/249). Richard stays up for two to four hours, then she feels exhausted and lays down (Doc. 11-1, p. 39/249). Richard testified that Geodon and Xanax cause drowsiness (Doc. 11-1, pp. 39-40/249).

Richard testified she is 5' 3" tall, weighs 205 pounds, and is right-handed (Doc. 11-1, p. 40/249). On a typical day, Richard awakens around 5 p.m. because her husband works at night and she is on his schedule (Doc. 11-1, p. 41/249). Richard dresses and takes her medications, then goes outside and smokes a cigarette (Doc. 11-1, p. 41/249). Richard walks the dog while her husband cooks supper around 6 p.m., eats supper, then sits and watches TV (Doc. 11-1, p. 41/249). Richard drinks from two quarts to a gallon of Kool-Aid or tea every day, so she goes to the bathroom every 30 to 60 minutes (Doc. 11-1, p. 41/249). Richard talks to her stepdaughter, smokes a cigarette outside every one to two hours (sitting on a chair close to the front

door), walks the dog every two hours after her husband goes to work, eats a snack, watches TV, lounges around the house, does light laundry twice a week, watches TV with her husband when he returns home, takes her medication, smokes another cigarette, then goes back to bed (Doc. 11-1, p. 41/249). When she does laundry, she has to take ten minute breaks to sit down because her back starts hurting and sometimes her hands hurt (Doc. 11-1, pp. 41-42/249).

The VE testified that Richard's work as an administrative coordinator, assistance service manager, and a service operation manager of a large grocery store meets DOT 169.167-010, "administrative assistant," which is sedentary work that requires some walking around periodically, SVP 7 (skilled work) (Doc. 11-1, p. 45/249). The VE testified that Richard has skills in retail grocery store management, handling personnel problems, keeping up with inventory, and making sure positions are properly manned (Doc. 11-1, p. 45/249). The VE further testified that Richard's work as head cashier (DOC 211.362-010, sedentary work, SVP 5) at a Lowe's gave her skills in keeping up with a lot of money, making sure things are properly accounted for and handled properly, and supervising cashiers (Doc. 11-1, p. 46/249).

The ALJ posed a hypothetical involving a person with Richard's work experience; who is limited to: unskilled, sedentary work; no more than frequent handling and fingering bilaterally; no more than occasional reaching; simple, routine tasks involving no more than simple short instructions and simple work-related decisions with few workplace changes; and no more than occasional interaction with co-workers and the general public (no teamwork) (Doc. 11-1, pp. 46-47/249).

The VE testified there would be very few jobs for such a person, with all of those limitations, because all of the unskilled jobs require some use of bimanual dexterity and handling (Doc. 11-1, p. 47/249).

### C. ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Richard (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Richard has not engaged in substantial gainful activity since May 20, 2011, that her disability insured status expired after

December 31, 2015, and that she has a severe impairment of fibromyalgia (Doc. 11-1, p. 15/249). The ALJ also found Richard does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 11-1, p. 19 /249). The ALJ then found that Richard had the residual functional capacity to perform the full range of sedentary work and was still able to perform her past relevant work as an administrative coordinator and a cash accounting clerk (Doc. 11-1, p. 23/249). The sequential analysis thus ended at Step 4, with a finding that Richard was not disabled from May 20, 2011 (the alleged disability onset date) through the date of the ALJ's decision on August 15, 2015 (Doc. 11-1, p. 24/249).[3]

II.  Law and Analysis

    A.  The ALJ did not err in finding Richard's mental impairments are not severe.

Richard contends the ALJ failed to properly assess her mental impairments at Step 2. Richard argues her bipolar disorder and anxiety are severe impairments, and the ALJ erred in affording too little weight to Dr. Cantu's opinion and too much weight to Dr. Kahler's opinion.

Because the treating physician is most familiar with the claimant's impairments, his opinion should be accorded great weight in determining disability. See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir .2011) (citing Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000). If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and

---

[3] The ALJ further found that a finding of "not disabled" is directed by Medical-Vocational Rule 201.28, in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (Doc. 11-1, p. 24/249).

is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)).  The weight given to opinions from non-examining physicians depends on the degree to which they provide supporting explanations for their opinions.  See id.  An ALJ is free to reject a physician's opinion when good cause exists.  See Giles, 433 Fed. Appx. at 246–47 (citing Newton, 209 F.3d at 455).

The ALJ found that Richard's "medically determinable mental impairments of bipolar affective disorder and an anxiety disorder, considered singly and in combination, do not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and are therefore non-severe" (Doc. 11-1, p. 18/249).  The ALJ found only mild limitations in Richard's activities of daily living, social functioning, and concentration, persistence or pace, and found no episodes of decompensation of extended duration[4] (Doc. 11-1, p. 18/249).

The ALJ gave little weight to the November 2014 opinion in the Mental Residual Functional Capacity Assessment completed by Dr. Cantu–that Richard's anxiety issues cause her to panic, which make her an unstable employee.  The ALJ found Dr. Cantu's opinion was not fully supported by his treatment notes or the overall medical evidence of record (Doc. 11-1, p. 23/249).  Thus, the ALJ found good cause to reject Dr. Cantu's opinion as unsupported by the medical evidence.

---

[4] The ALJ noted that Richard's treatment at Brentwood Hospital occurred prior to the alleged disability onset date (Doc. 11-1, pp. 18/249).  Moreover, that episode appeared to be an isolated incident with subsequent sustained improvement, since Richard did not receive mental health treatment from March 2011 to September 2012 (Doc. 11-1, pp. 18/249).

The ALJ gave "great weight" to the February 2014 opinion of Dr. Kahler, the state agency medical consultant, who concluded that, despite Richard's history of emotional problems, the current evidence showed she was able to think clearly, communicate, and care for her own needs, get along with others, and perform usual activities of daily living (Doc. 11-1, p. 23/249).

The ALJ further found that Richard's complaints of disabling symptoms were not credible (Doc. 11-1, p. 18/249). The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. See Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983) (citing Laffoon v. Califano, 558 F.2d 253, 254-55 (5th Cir. 1977); see also Dominguez v. Astrue, 286 Fed. Appx. 182, 186 (5th Cir. 2008). A factfinder's evaluation of the credibility of subjective complaints if entitled to judicial deference if supported by substantial record evidence. Dominguez, 286 Fed. Appx. at 186 (citing Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. See Falco v. Shalala, 27 F.3d 160, 163-64 (5th Cir. 1994).

The ALJ noted that Richard's treatment records indicated she had improved with medications, had denied medication side effects, had not exhibited socially inappropriate behavior, and had no problems with her peer groups (Doc. 11-1, p. 22/249). The ALJ also found that, although Richard alleged daily episodes of anxiety

and fearfulness, she managed to walk her dog several times daily[5] and went outside to smoke multiple times daily (Doc. 11-1, p. 22/249). The ALJ found Richard's mental health impairments resulted in no more than minimal limitations of her functioning and were therefore non-severe (Doc. 11-1, p. 22/249).

Since the ALJ made the mandatory indication of the basis for her credibility choices concerning Richard's complaints, and since her choices are not unreasonable, her finding that Richard's anxiety and depression would not prevent Richard from performing work is proper. See Carry v. Heckler, 750 F.2d 479, 485 (5th Cir. 1985).

Substantial evidence supports the Commissioner's conclusion that Richard's mental impairments are not severe.

### B. The ALJ's residual functional capacity determination is supported by substantial evidence.

Richard contends the ALJ's residual functional capacity assessment that she can perform "light" work is not supported by substantial evidence. However, the ALJ found Richard can only do sedentary work and did not find she can do light work (Doc. 11-1, p. 19/249). Therefore, this argument lacks a basis in fact.

To the extent Richard argues the ALJ's residual functional capacity assessment for sedentary work is unsupported by substantial evidence, Dr. Lazaro's opinion, as well as Richard's description of her daily activities, support that conclusion.

---

[5] Richard complains that she testified she lets the dog out. Richard described her method for letting the dog out, by putting a treat in her pocket so the dog would return. However, "letting the dog out" is not the same as "walking the dog." Richard also testified that she walks the dog several times daily.

Richard also contends the ALJ overlooked Dr. Lazaro's opinion that Richard can do only frequent handling and fingering bilaterally, can only occasionally reach bilaterally, needs to change position every 1-2 hours, and needs to take breaks every 2-3 hours. Richard further argues the ALJ erred in finding her complaints of pain were not credible.

The ALJ specifically noted Dr. Lazaro's statements: "Dr. Lazaro reported that the claimant would require changes in positions every one to two hours and would require breaks every two to three hours during the workday. The Administrative Law Judge gives some weight to this opinion, but only to the extent that it supports the assessed residual functional capacity." Although the ALJ overlooked Dr. Lazaro's limitation of no more than occasional reaching bilaterally[6] (Doc. 11-1, p. 22/249), he expressly rejected any limitations not consistent with the assessed residual functional capacity of the full range of sedentary work (Doc. 11-1, p. 22/2249) The ALJ's finding that Richard can reach is consistent with his conclusion that her complaints of pain are only partially credible, as discussed below.

The ALJ found Richard's statements concerning the intensity, persistence, and limiting effects of [her] symptoms were only partially credible:

> With regard to the claimant's severe impairment of fibromyalgia, the undersigned finds that the claimant may have some issues due to the symptoms of this impairment. However, the alleged severity of her fibromyalgia is not supported by the overall medical evidence of record. The claimant's allegations that she had chronic pain all over her body appear to be less than fully credible… In fact, Dr. Lazaro opined that the claimant's fibromyalgia was considered to be a secondary impairment….

---

[6] Both jobs identified by the VE, administrative assistant, DOT 169.167-010, and Cashier I, DOT 211.362/010, require frequent reaching.

> Dr. Lazaro completed a Medical Source Statement in September 2014. In this statement, Dr. Lazaro reported that the claimant would require changes in positions every one to two hours and would require breaks every two to three hours during the workday. The Administrative Law Judge gives some weight to this opinion, but only to the extent that it supports the assessed residual functional capacity.

Since the ALJ has stated the basis for his credibility determination, his finding that Richard can perform the full range of sedentary work is supported by substantial evidence. Moreover, it is noteworthy that Dr. Lazaro never found Richard is unable to work.

The ALJ properly considered the record as a whole, including the available medical evidence and the nature and extent of Richard's daily activities, in determining that her subjective complaints were not fully credible. See Hoelck v. Astrue, 261 Fed. Appx. 683, 686 (5th Cir. 2008) (finding plaintiff with fibromyalgia, bipolar disorder, anxiety disorder, and osteoporosis could do light work).

Richard also alleges the ALJ erred in failing to order a consultative examination to assess the full extent of her mental and physical impairments. The ALJ has the discretion to order a consultative examination. An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision. See Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989); see also Robinson v. Barnhart, 183 Fed. Appx. 451, 454-55 (5th Cir. 2006); Brock v. Chater, 84 F.3d 726 (5th Cir. 1996). The ALJ had medical source statements from Dr. Cantu and Dr. Lazaro. Nothing in the record shows a consultative examination was necessary for

the ALJ to make a decision. The ALJ did not err by failing to order a consultative examination.

### III. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Richard's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 22nd day of January, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge